**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| John McMorrow Jr., on behalf of himself and all others similarly situated,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>Core Properties, LLC, and Growth Developments, LLC,<br><br>　　　　　Defendants. | CASE NO. 4:23-cv-126-JAR |

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY**

## Table of Contents

Introduction ............................................................................................................................. 1

Applicable Standard ................................................................................................................. 2

Applicable Law ........................................................................................................................ 3

Argument ................................................................................................................................. 4

    I.    Most elements of Plaintiff's claims are not subject to reasonable dispute. ........................ 4

    II.    The text messages that Defendants sent to Plaintiff's cellular telephone number qualify as "telemarketing" or "solicitation" messages ................................................................................... 6

        A.    Through its 2005 Report, the FCC stated that conduct materially identical to Defendants' conduct qualified as a "telephone solicitation." ................................................ 7

        B.    Defendants' text messages implicitly offer a handful of services to Plaintiff and the factual record demonstrates that they do in fact provide those services to facilitate real estate transactions. ....................................................................................................................... 8

        C.    Defendants charge a substantial effective fee in purchasing homes and providing their services to those consumers ............................................................................................... 13

Conclusion ............................................................................................................................. 15

## Table of Authorities

**Cases**

*Anderson v. Catalina Structured Funding, Inc.*, No. 1:21-cv-197, 2021 U.S. Dist. LEXIS 242657 (W.D. Mich. Dec. 21, 2021) ......................................................................... 8, 9, 13, 14

*Buja v. Novation Capital, Ltd. Liab. Co.*, No. 15-81002-CIV-MARRA, 2017 U.S. Dist. LEXIS 231500 (S.D. Fla. Mar. 30, 2017) ........................................................................... 9

*Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913 (9th Cir. 2013) .................................... 7

*Chinitz v. NRT W., Inc.*, No. 18-cv-06100-NC, 2019 U.S. Dist. LEXIS 27134 (N.D. Cal. Feb. 20, 2019) ................................................................................................................. 7

*Eagle v. GVG Capital, LLC*, No. 22-cv-00638-SRB, 2023 U.S. Dist. LEXIS 15834 (W.D. Mo. Jan. 31, 2023) ................................................................................................. 10

*Gessele v. Jack in the Box, Inc.*, No. 3:10-cv-960-ST, 2012 U.S. Dist. LEXIS 120377 (D. Or. Aug. 24, 2012) .................................................................................................... 3

*L.C. Goliday v. GKN Aerospace-St. Louis Aerospace*, 2012 U.S. Dist. LEXIS 97474 (E.D. Mo. July 13, 2012) ............................................................................................... 3

*Less v. Quest Diagnostics Inc.*, 515 F. Supp. 3d 715 (N.D. Ohio 2021) ...................... 13

*Levine Hat Co. v. Innate Intelligence, LLC*, 538 F. Supp. 3d 915 (E.D. Mo. 2021) ................... 13

*Pepper v. GVG Capital LLC*, No. H-22-2912, 2023 U.S. Dist. LEXIS 100425 (S.D. Tex. June 9, 2023) .............................................................................................................. 10, 14

*Pinkham v. Sara Lee Corp.*, 983 F.2d 824 (8th Cir. 1992) ........................................... 6

*Residential Funding Co., LLC v. Terrace Mortg. Co.*, 725 F.3d 910 (8th Cir. 2013) ................... 3

*Riazi v. Ally Fin., Inc.*, No. 4:17CV1705JCH, 2017 U.S. Dist. LEXIS 157011 (E.D. Mo. Sep. 26, 2017) ................................................................................................................. 3

*Rosenberg v. LoanDepot.com LLC*, 435 F. Supp. 3d 308 (D. Mass. 2020) .................. 5

*Scott v. Pub. Sch. Ret. Sys. of Mo.*, No. 09-4241-CV-C-NKL, 2010 U.S. Dist. LEXIS 99661 (W.D. Mo. Sep. 21, 2010) ............................................................................................ 13

**Statutes**

47 U.S.C. § 227 ............................................................................................................. 3, 7

**Other Authorities**

*In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 20 F.C.C. Rcd. 3788 (2005) ................................................................................................................ 7

**Rules**

Fed. R. Civ. P. 56 .......................................................................................................................... 3

**Introduction**

The Telephone Consumer Protection Act ("TCPA") generally stands for a simple proposition: companies may not harass or spam consumers' telephone numbers without first obtaining their consent. Core Properties, LLC, and Growth Developments, LLC ("Defendants") mistakenly believe they have found a loophole in this general principle and operate a business model that ignores the TCPA's principal tenets. Here, Defendants delivered a series of text messages to John McMorrow, Jr.'s ("Plaintiff") cellular telephone number, which he registered on the National Do-Not-Call Registry ("DNC Registry") and which he uses as his personal residential telephone number. Defendants did this without Plaintiff's prior express written consent, and as a matter of course, believe they are not required to obtain consent. The only issue before the Court is whether these text messages constitute telemarketing or solicitation messages under the TCPA. If the Court determines that they do, then Defendants have violated the TCPA.

The TCPA prohibits any person from placing more than one advertisement or marketing telephone call or text message to residential telephone numbers registered with the DNC Registry without the prior express written consent of the recipient. And, even if the party delivering those communications has the prior express written consent of the recipient, the TCPA further requires that a telemarketer provide "the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted," in the messages that telemarketer delivers to consumers. Failing to obtain prior express written consent or failure to provide those required telemarketing disclosures entitles a consumer to $500 for each violation of the TCPA—an award a court has discretion to treble.

Defendants believe that the text messages they delivered to Plaintiff's phone were not "telemarketing" or "solicitation" messages, and outside the scope of the TCPA, because they were offers to purchase properties, not offers to sell a good or service. Therefore, Defendants believe

that the TCPA's telemarketing regulations do not apply to them. However, this interpretation ignores FCC guidance stating that similar real estate communications are regulated "solicitations." More significantly, this interpretation ignores the reality of Defendants' conduct: Defendants (1) send multiple text messages to numerous homeowners in an attempt to identify interested sellers; (2) make offers to purchase that home and pair that purchase offer with all of the services traditionally associated with real estate agents, such as identifying third-party buyers, determining the fair market value of the property, and arranging for escrow and title services; (3) identify interested third-party purchasers and arrange for those purchasers to either (a) make same-day— or nearly same-day—purchases of those properties for a hefty premium, or (b) reassign the pending purchase agreements with the consumers to third parties in exchange for substantial fees; and (4) arrange the contracts and services necessary to execute those transactions. In exchange for these various offerings, Defendants receive substantial profits on these transactions that would otherwise have been paid to the consumer. In other words, the consumer effectively pays for Defendants' services by accepting Defendants' discounted offers on their homes, and Defendants are compensated for their services through the concurrent mark-up and resale of those homes. Defendants' contrary position that the services it offers are "free" is analogous to a real estate agent claiming to represent home sellers for "free" because their commission is taken out of the proceeds paid by the buyer, rather than a direct cash payment from the seller. This, of course, would be disingenuous and false.

For all of these reasons, and those discussed below, the Court should grant summary judgment to Plaintiff on the issue of whether Defendants' communications qualify as telemarketing messages as defined by the TCPA, and therefore, Plaintiff's individual claims.

## **Applicable Standard**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party bears the burden of providing the court with the basis for its motion. *L.C. Goliday v. GKN Aerospace-St. Louis Aerospace*, No. 4:11CV729 JCH, 2012 U.S. Dist. LEXIS 97474, at *7 (E.D. Mo. July 13, 2012).[1] However, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." *Id.* A party opposing summary judgment "may not merely point to unsupported self-serving allegations. Instead, the party must substantiate its allegations with sufficient probative evidence that would permit a finding in its favor." *Residential Funding Co., LLC v. Terrace Mortg. Co.*, 725 F.3d 910, 915 (8th Cir. 2013).

Relevant, too, is that, "because the TCPA is a remedial statute, it should be liberally construed in favor of the consumer." *Riazi v. Ally Fin., Inc.*, No. 4:17CV1705JCH, 2017 U.S. Dist. LEXIS 157011, at *14 (E.D. Mo. Sep. 26, 2017).

## **Applicable Law**

Relevant to this matter, pursuant to 47 U.S.C. § 227(c)(5)(B) of the TCPA:

> A person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may, if otherwise permitted by the laws or rules of court of a State bring in an appropriate court of that State . . . (B)an action to recover for actual monetary loss from such a violation, or to receive up to $500 in damages for each such violation, whichever is greater.

The "regulations prescribed under this subsection" refer, in relevant part, to 47 C.F.R. § 64.1200. At issue in this matter are two subsections of § 64.1200: subsections (c)(2) and (d)(4). 47

---

[1] Typically, seeking a ruling on summary judgment prior to a ruling on class certification runs afoul of the "one-way intervention doctrine." However, Defendants agreed to waive that issue here by insisting upon the bifurcation of discovery and dispositive motion briefing on Plaintiff's claims prior to a motion for class certification. Moreover, by "filing a motion for summary judgment prior to class certification, the defendant accepts the potential unfairness of one-way intervention." *Gessele v. Jack in the Box, Inc.*, No. 3:10-cv-960-ST, 2012 U.S. Dist. LEXIS 120377, at *7 (D. Or. Aug. 24, 2012).

C.F.R. § 64.1200(c)(2) states, in relevant part, that "(a) No person or entity shall initiate any telephone solicitation to: . . . (2) A residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government."

47 C.F.R. § 64.1200(d)(4) states, in turn, the following:

(d) No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures[, including] . . . (4) Identification of sellers and telemarketers. A person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted."

The TCPA's implementing regulations define "solicitation" and "telemarketing" similarly: "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. §§ 64.1200(f)(13), (15). Thus, for Plaintiff's DNC Registry claim: he must show that he (1) registered his telephone number on the DNC Registry at least 30 days prior to receiving the subject messages; (2) did not provide prior express written consent to Defendants to receive those messages; (3) used his telephone number as his residential telephone number rather than for business; (4) received more than one text message from Defendants within a one-year period; and (5) the text messages at issue qualify as "solicitation" or "telemarketing." Regarding the "sender identification" claim, Plaintiff must meet elements 1 and 3-5, and that Defendants did not disclose "the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted."

<u>**Argument**</u>

**I.    Most elements of Plaintiff's claims are not subject to reasonable dispute.**

As detailed in Plaintiffs' Statement of Uncontroverted Material Facts, there is no genuine

dispute regarding all but one of the material facts at issue in this case. First, Plaintiff registered his cellular telephone number on the DNC Registry on February 10, 2008. *See* Statement of Uncontroverted Facts ("SUF") ¶ 17. Plaintiff received the text messages at issue between July 9, 2022 and January 11, 2023. SUF ¶ 29. As Plaintiff received the text messages over a decade after he registered his telephone number on the DNC Registry, this first element is met.

Second, Defendants admit that they did not obtain prior express written consent before contacting Plaintiff. SUF ¶ 28. Generally, Defendants obtain contact information for suspected homeowners from Audantic Real Estate Data Analytics ("Audantic") after Defendants provide Audantic with search criteria. *See* SUF ¶¶ 21-24. After obtaining those results, Defendants do not scrub those results against the DNC Registry, and send those phone numbers to another vendor, 1000 Calls a Day, to deliver text messages to those telephone numbers. *See* SUF ¶¶ 24-29. Defendants do not scrub the results against the DNC Registry because they do not believe that they are required to do so. *See* SUF ¶ 37.[2] Thus, Plaintiff meets the "consent" element of his claim.

Third, there is no genuine dispute that Plaintiff, at all relevant times, used his cellular telephone number as his residential telephone number. *See* SUF ¶ 15. Plaintiff used Verizon as his residential cellular service provider. *Id.* The FCC's policy is that "cellular numbers that [have been] placed on the [Do Not Call] registry [are] presumed to be residential." *Rosenberg v. LoanDepot.com LLC*, 435 F. Supp. 3d 308, 324 (D. Mass. 2020) (citing *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14039 (2003)) (finding that plaintiff "properly alleged that his cellphone [was] a residential line" by alleging that he (1) "placed his cellular phone number on the National Do Not Call registry" and (2) "use[d] his cell

---

[2]      Defendants signed a disclaimer and waiver through which they attest that they "understand the risks involved with calling consumers on the do-not-call list" and that they would, accordingly, hold their calling vendor harmless for any liability associated with doing so. *See* SUF ¶ 38.

phone as his residential line"). Additionally, Defendants acknowledge that they delivered text messages to Plaintiff's cellular telephone number after obtaining that telephone number from Audantic—a third-party vendor that associates the consumer contact information of suspected homeowners with residential properties and neighborhoods. SUF ¶¶ 21-24. Thus, there is no genuine dispute that Plaintiff used his cellular telephone number as a residential number.

Lastly, there is no genuine dispute that Defendants failed to disclose "the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted" in its text messages to Plaintiff's cellular telephone number. That omission is self-evident based on the parties' records of the text messages. *See* SUF ¶ 30. As such, Plaintiff satisfies this element as well.

Because there is no genuine dispute of these material facts, it is up to the Court to address one remaining issue: whether Defendants' text messages and associated business practices qualify as "telemarketing" or "solicitation" under the TCPA.[3]

## II.   The text messages that Defendants sent to Plaintiff's cellular telephone number qualify as "telemarketing" or "solicitation" messages.

Given Defendants' admissions, the issue for the Court to address is whether Defendants' communications qualified as "solicitation" or "telemarketing." For all of the reasons discussed below, and based on the record evidence Plaintiff presents, the Court should find that they do.

---

[3]      Defendants are jointly liable for their violations of the TCPA. Core Properties, LLC, ("CP") and Growth Developments, LLC ("GD") are jointly owned and managed, but GD is the true operating entity, whereas CP is essentially a holding company for Defendants' IP and branding. SUF ¶¶ 5-9.  If CP claims to not be responsible for GD's conduct, it should be held liable under a theory of apparent authority, given that GD used CP's name and intellectual property to transact with consumers, and both parties consented to those representations. *Accord Pinkham v. Sara Lee Corp.*, 983 F.2d 824, 830 (8th Cir. 1992).

A.      **Through its 2005 Report, the FCC stated that conduct materially identical to Defendants' conduct qualified as a "telephone solicitation."**

As a starting point, the FCC's guidance on this matter is particularly instructive. Congress charged the FCC with implementing the Federal Do-Not-Call rules. 47 U.S.C. § 227(c)(1). In 2005, the National Association of Realtors petitioned the FCC for an exemption from the Do-Not-Call rules' definition of "solicitation" for calls made by real estate agents to property owners with lapsed real estate listings, where the real estate agent solicits their services to a prospective seller. *In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 20 F.C.C. Rcd. 3788 (2005) ("2005 FCC Report"). In interpreting the definition of "telephone solicitation," the FCC rejected this exemption, and concluded "that a telephone solicitation would include calls by real estate agents to property owners for the purpose of offering their services to the owner, whether the property listing has lapsed or not." *Id.* at 3793-94.

Similarly—and consistent with the FCC's instruction—a real estate brokerage advertising its "real estate brokerage services" to unrepresented consumers is a communication "[whose] sole purpose . . . is to allow NRT to pitch its brokerage services to the called party," and is therefore, "made 'for the purpose of encouraging the purchase' of NRT's brokerage services." *Chinitz v. NRT W., Inc.*, No. 18-cv-06100-NC, 2019 U.S. Dist. LEXIS 27134, at *6-7 (N.D. Cal. Feb. 20, 2019) (denying motion to dismiss as "the Court can plausibly infer that the purpose of the calls was to encourage the purchase of NRT's services, *i.e.*, telemarketing."). Lastly, whether calls constitute "telemarketing" should be approached "with a measure of common sense." *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2013). And whether a call is made for telemarketing purposes "should turn, not on the caller's characterization of the call, but on the purpose of the message." *Id.* Given all of this, and for the reasons explained *infra* Argument §§ II.B-C, Defendants' communications were "telemarketing" or "solicitations" under the TCPA.

**B.** **Defendants' text messages implicitly offer a handful of services to Plaintiff and the factual record demonstrates that they do in fact provide those services to facilitate real estate transactions.**

Defendants contend that they need not heed the DNC Registry because their text campaigns to numerous homeowners across multiple states are not "solicitations" or "telemarketing" messages, as the messages offer to *buy* Plaintiff's home and not *sell* goods, services, or investments. However, this overly narrow interpretation of the TCPA is wrong as it ignores the broader context of real estate transactions, the nature of Defendants' business, and the holdings of several cases that concluded that materially similar allegations state a claim under the TCPA.

In *Anderson v. Catalina Structured Funding, Inc.*, the court addressed whether a company calling consumers to purchase structured annuities from those consumers was delivering "solicitation" or "telemarketing" messages. No. 1:21-cv-197, 2021 U.S. Dist. LEXIS 242657 (W.D. Mich. Dec. 21, 2021). The defendant allegedly called the plaintiff's cellular telephone number three times—without prior express written consent, and despite the plaintiff registering her telephone number on the DNC Registry—to market the defendant's business: purchasing structured settlements or annuities from consumers in exchange for immediate cash. *See generally id.* The defendant argued that the communications had a singular purpose: to purchase property from the consumer plaintiff, whereas the plaintiff alleged that the purchase offer "was an offer to sell the service of converting [the plaintiff's] structured settlement into a lump sum payment." *Id.* at *2. The court agreed with the plaintiff and concluded that the plaintiff sufficiently alleged a violation of the same TCPA claims Plaintiff advances here.

In reaching that conclusion, the court found that offers to purchase annuities were a hybrid offer to purchase something and also to sell a service. *Id.* at *17. ("Here, though, where Plaintiff has expressed no interest in selling, and Defendant is in the business of offering liquidity to structured settlement holders, Defendant may be offering to make a purchase, but it is also

marketing a service. To suggest it is not is too clever by half."). This is because, in offering to purchase those annuities, the defendant also paired that offer with "free" services necessary to complete the transactions, such as "processing payment applications, computing the present value of the structured settlement, filing all necessary legal documents, and the like." *Id.* at *13. The court did not credit the defendant's arguments that the "free" services did not include separately itemized fees so no "sale" of those services occurred: "Catalina's argument sounds a little like a real estate buyer's agent who tells his or her client that the home sellers will pay the fees associated with the buyer's agent's services, rather than the buyer. That is ridiculous, of course: the buyer could offer to pay less for the house if the seller did not have to pay the buyer's agent's fees." *Id.*

In reaching this conclusion, the *Anderson* court repeatedly cited to *Buja v. Novation Capital, Ltd. Liab. Co.*, which also involved the sale of structured settlements. No. 15-81002-CIV-MARRA, 2017 U.S. Dist. LEXIS 231500 (S.D. Fla. Mar. 30, 2017). The *Buja* court similarly concluded that a transaction that pairs an offer of services necessary with a purchase could constitute telemarketing. *Id.* at *20 ("As part of the transaction, a structured-settlement company, such as Defendants, may perform a number of services to effectuate the transaction . . . [.]").

Building off this authority, and even more directly-applicable here, two courts—including one within this Circuit—applied these same principles to deny motions to dismiss involving other senders of "purchase" offers to homeowners absent prior express written consent, and in disregard of the DNC Registry. First, in *Eagle v. GVG Capital, LLC*, the court faced materially identical allegations to those in this matter: the plaintiff brought claims under the TCPA against a defendant who sent repeated text messages to her cellular telephone number, absent prior express written consent, for the purposes of inquiring regarding the plaintiff's interest in selling her home. No. 22-cv-00638-SRB, 2023 U.S. Dist. LEXIS 15834, at *7 (W.D. Mo. Jan. 31, 2023). There, like here,

the plaintiff was not attempting to sell her home at any time surrounding the relevant time period, and had registered her telephone number on the DNC Registry. The defendant moved to dismiss, arguing, in relevant part, that the text messages were not "telemarketing" or "solicitations" because "Defendant argues that it 'is alleged to have made an offer to buy [the plaintiff's] property, pure and simple. As [the defendant] is not alleged to have sent texts encouraging Plaintiff to buy or rent anything, it did not make a telephone solicitation.'" *Id.* at *6. The court, however, found that the allegation that the defendant bundled necessary ancillary services with the purchase of a home, along with the alternative allegation that the defendant sold interested consumer leads to third party purchasers, sufficiently alleged an actionable claim. *See id.* at *7-9.

Then, in *Pepper v. GVG Capital LLC*, another court similarly denied a motion to dismiss based on the same issues. No. H-22-2912, 2023 U.S. Dist. LEXIS 100425 (S.D. Tex. June 9, 2023). There, the court expanded on the holding in *Eagle*, holding:

> Pepper's allegations that GVG Capital provides the necessary services associated with a real estate transaction, and that the seller effectively pays for those services through GVG Capital's payment of a discounted purchase price, are sufficient to state a claim. Unlike repairs made to the property, the transfer of title is part of the sale transaction. To sell property, one or both parties to the sale must pay certain transaction costs. Pepper alleges that GVG Capital pays those costs out of the funds that would otherwise be paid to the seller. GVG Capital argues that this "effective fee" is not an "actual fee." This argument makes a distinction without a difference—Pepper would pay that fee whether she made the payment directly or indirectly, by discounting the sale price. The court assumes, as it must on this motion to dismiss, that Pepper's allegations about the structure of real estate transactions are true. The allegations state a claim for violations of the TCPA.

*Id.* at *6-7.

In light of the foregoing authority, Defendants' actual practices and conduct make abundantly clear that, in offering to purchase a consumer's home, Defendants pair numerous services provided by a traditional real estate agent in representing that consumer. Specifically, a real estate agent representing a seller (1) consults the seller to determine a price for the property;

(2) lines up services necessary to effectuate the home sale—including arranging for escrow, title, recording, and any other third-party services required to consummate the transaction; (3) identifies and connects the seller with third-party buyers; and (4) assists the seller in executing the necessary paperwork to complete the transaction. *See* SUF ¶ 41. Defendants provide these same services as they (1) contact suspected homeowners, based on lists provided by their data vendor, Audantic, to gauge their interest in selling a home; (2) discuss the potential sale—and sale price—of the home with the homeowner, and reach an agreed price; (3) arrange for all services necessary to consummate the transaction; (4) identify potential third-party buyers of that home; and (5) execute all necessary paperwork to complete the transaction and then re-sell the property. *See* SUF ¶ 42.

To the extent Defendants inevitably contend that its resale of the subject properties is a separate and distinct transaction—such that they consider their transactions with consumers to be unrelated to their parallel transactions with third-party investors—the reality of Defendants' business model undercuts its argument. As a threshold matter, even if the Court ignores whether Defendants do in fact "identify potential third-party buyers" for the homeowner, similar to the plaintiff in *Pepper*, the homeowner is nevertheless paying Defendants an effective fee to "arrange for all services necessary to consummate the transaction" and "execute all necessary paperwork to complete the transaction." As discussed *infra* Argument § II.C, it is clear that given the significant profit Defendants make in their transactions, buyers pay an "effective fee" to Defendants for these services by accepting a significant discount on the market value of their home.

Notwithstanding that part of the fee homeowners effectively pay Defendants is related to the services they provide to consummate the real estate transaction, Defendants also act as *de facto* seller's agents by marketing to and securing third-party buyers of the subject property in exchange for a substantial payment. ██████████████████████████████████████████



---

[4]     For these same-day resale transactions, Defendants typically did not occupy the property or make any changes to it whatsoever prior to selling the property to the third-party buyer. SUF ¶¶ 52-53.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

**C.     Defendants charge a substantial effective fee in purchasing homes and providing their services to those consumers.**

Lastly, to qualify as "telemarketing" or a "solicitation," in addition to offering services as discussed *supra* Argument §§ II.A-B, there must be an offer to "sell" the services. Defendants contend that they do not sell anything, and instead provide the various services and arrange for the transactions for "free." But this ignores the reality of Defendants' business and the transactions, and, as *Anderson* succinctly stated, "is too clever by half." 2021 U.S. Dist. LEXIS 242657, at *17.

In determining whether a service is truly "free" versus something a consumer pays for, "[c]ourts may look beyond the pretextual claim that a service is 'free' when determining whether it is a solicitation under the TCPA." *Less v. Quest Diagnostics Inc.*, 515 F. Supp. 3d 715, 717-18 (N.D. Ohio 2021); *Levine Hat Co. v. Innate Intelligence, LLC*, 538 F. Supp. 3d 915, 921 (E.D. Mo. 2021) (in TCPA fax case, finding that subject faxes offering free lunch seminars qualified as "advertisements" because they were intended to promote the services offered by the defendant). And, in the context of bundling "free" services with a purchase offer, ultimately, "the question of whether the payee pays the fees for services separately from an itemized list or as part of a reduced lump sum payment is irrelevant to the question of whether the payee pays fees as part of the transaction." *Anderson*, 2021 U.S. Dist. LEXIS 242657, at *16-17. This is because "[i]t is axiomatic that money is fungible." *Scott v. Pub. Sch. Ret. Sys. of Mo.*, No. 09-4241-CV-C-NKL, 2010 U.S. Dist. LEXIS 99661, at *21 (W.D. Mo. Sep. 21, 2010). So, any money that the third-

party purchaser pays to Defendants in excess of the purchase price Defendants paid to the consumer would, in effect, compensate Defendants for all of its services, including arranging the transaction, completing the necessary paperwork, and identifying a buyer for the transaction, thereby depriving the consumer of money that would otherwise have been available to them directly. *See Anderson*, 2021 U.S. Dist. LEXIS 242657, at *13 (noting, by way of analogy, that "a real estate buyer's agent who tells his or her client that the home sellers will pay the fees associated with the buyer's agent's services . . . is ridiculous [because] the buyer could offer to pay less for the house if the seller did not have to pay the buyer's agent's fees."). As a result, if a business provides a "free" service, and pairs that with a manipulation of the sales price, that business charges the consumer an effective fee for its services. *See Pepper*, 2023 U.S. Dist. LEXIS 100425, at *6-7 (noting that charging a consumer an "effective fee" via a discounted sale price is actionable under the TCPA, because the consumer "would pay that fee whether she made the payment directly or indirectly, by discounting the sale price.").

In light of that standard, and as added background, real estate agents that represent sellers are typically compensated by way of a relatively-modest 6% commission on the sale price of a home (typically split between the buyer's agent and seller's agent), with their portion of the proceeds coming out of the lump sum paid by the purchaser. SUF ¶ 45. Defendants are paid a similar way. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████



Thus, in exchange for providing the same services as a real estate agent—determining a sale price, arranging for all ancillary services necessary for a real estate transaction, assisting with the completion of purchase and sale paperwork, and identifying a third-party buyer—Defendants are compensated in the same way: via payment from the proceeds of the sale of a home to a third-party purchaser. The primary difference is that, rather than charging a lump-sum fee or a specified percentage for providing these services to the homeowner, Defendants instead negotiate a far higher percentage of the sale price as their profit on the transaction with the purchaser, hide the true proceeds of the transaction from the consumers they transact with, and pocket 100% of those proceeds for themselves. *See, e.g.*, SUF ¶¶ 52-53 (noting that Defendants do not, as a matter of course, disclose the contemporaneous resale prices or assignment fees to consumers). In fact, while defending their failure to disclose the *true* sale price of the consumers' home, Defendants offered this apt analogy: "A car dealership does not disclose to a consumer what they resell their trade in for." SUF ¶ 54. However, car salesmen are subject to the TCPA, and so Defendants should be too.

<u>Conclusion</u>

For all of these reasons, the Court should find that Defendants are not entitled to wantonly ignore the DNC Registry and TCPA, and find that their conduct violated the TCPA.

Date: September 15, 2023                    /s/ Alex D. Kruzyk
                                            Alex D. Kruzyk
                                            E.D. Mo. Bar No. 24117430(TX)
                                            Bryan A. Giribaldo (*pro hac vice*)
                                            State Bar. No. 24124547(TX)
                                            **PARDELL, KRUZYK & GIRIBALDO, PLLC**
                                            501 Congress Avenue, Suite 150
                                            Austin, Texas 78701
                                            Tele: (561) 726-8444
                                            akruzyk@pkglegal.com
                                            bgiribaldo@pkglegal.com

                                            *Counsel for Plaintiff and the proposed classes*

## CERTIFICATE OF SERVICE

I certify that on September 15, 2023, the foregoing document was filed with the Court using CM/ECF, which will send notification of such to all counsel of record.

                                            /s/ Alex D. Kruzyk
                                            Alex D. Kruzyk