**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

JOHN McMORROW, on behalf of himself )
and others similarly situated, )
)
     Plaintiff, )
)
  v. )        No. 4:23-cv-00126-JAR
)
CORE PROPERTIES, LLC, et al. )
)
     Defendants. )
)

**MEMORANDUM AND ORDER**

This matter is before the Court on the Parties' cross motions for summary judgment.

ECF Nos. 38 and 43.  These motions are fully briefed and ready for disposition.  For the reasons

set forth below, the Court will deny Defendants' Motion for Summary Judgment (ECF No. 38)

and grant Plaintiff's Motion for Partial Summary Judgment as to Liability (ECF No. 43).

**Background**

A.    <u>Plaintiff's Complaint</u>

On February 3, 2023, Plaintiff filed his original class action Complaint in this Court

alleging violations of the Telephone Consumer Protection Act ("TCPA"), specifically 47 U.S.C.

§ 227(c)(5), against Defendant Core Properties, LLC.  ECF No. 1.  After conducting limited

discovery, and with Core Properties' consent, Plaintiff filed an Amended Complaint that names

Growth Development, LLC as an additional Defendant.  ECF No. 28.

In his Amended Complaint, Plaintiff alleges that he uses his cellular telephone number as

his residential telephone number, and he that he registered that number with the National Do-

Not-Call Registry ("DNCR") in 2008.  Plaintiff further alleges that, from October 2022 through

February 2023, Defendants sent multiple text messages to his cellular telephone number.

Plaintiff alleges that the text messages asked about his willingness to sell his real property for the

purpose of encouraging Plaintiff to purchase Defendants' services related to selling his home.

He alleges that he never consented to receiving the text messages and that the text messages did

not indicate on whose behalf they were sent.  Accordingly, Plaintiff alleges that Defendants sent

the text messages in violation of the TCPA's prohibition against sending more than one

solicitation within a twelve-month period for the purposes of soliciting the purchase of products

or services to phone numbers included in the DNCR and without identifying on whose behalf the

text messages were sent.  *See* 47 U.S.C. § 227(c)(5); 47 C.F.R. 64.1200(c)(2) and (d)(4).

Based on his belief that he was not the only person receiving these or substantially

similar text messages from Defendants, Plaintiff seeks to become the class representative for two

proposed classes.  Plaintiff defines the "Federal Do-Not-Call Registry Class" as:

> All persons throughout the United States (1) to whom Core Properties, LLC or
> Growth Development, LLC delivered, or caused to be delivered, more than one
> text message within a 12-month period, promoting Core Properties, LLC's,
> Growth Development, LLC's, or their business partners' goods or services, (2)
> where the person's residential telephone number had been registered with the
> National Do Not Call Registry for at least thirty days before Core Properties, LLC
> or Growth Development, LLC delivered, or caused to be delivered, at least two of
> the text messages within the 12-month period, (3) within four years preceding the
> date of the original complaint through the date of class certification.

ECF No. 28 at ¶ 43.

Plaintiff defines the "Sender Identification Class" as:

> All persons and entities throughout the United States (1) to whom Core
> Properties, LLC delivered, or caused to be delivered, more than one text message
> within a 12-month period, promoting Core Properties, LLC's, Growth
> Development, LLC's, or their business partners' goods or services, (2) where the
> subject text messages did not state the name of the individual caller, the name of
> Core Properties, LLC or Growth Development, LLC, and a telephone number or
> address at which Core Properties, LLC or Growth Development, LLC may be
> contacted, (3) within four years preceding the date of the original complaint
> through the date of class certification.

*Id.* Plaintiff has yet to seek certification for these proposed classes.

Plaintiff brings two claims against Defendants for the alleged violations of the TCPA. Count I is raised on behalf of the Federal Do-Not-Call Registry class, and Count II is raised on behalf of the Sender Identification Class.

B.    The Motions for Summary Judgment

On September 15, 2023, Defendants Core Properties and Growth Development filed a motion for summary judgment, memorandum of law in support, and statement of undisputed materials facts.  ECF Nos. 38 and 39.  On October 16, 2023, Plaintiff filed his Memorandum in Opposition to Defendants' motion and Response to Defendants' Statement of Materials Facts.[1] ECF Nos. 51 and 52.  On October 27, 2023, Defendants filed their Reply.  ECF No. 55.

On September 18, 2023, Plaintiff filed his Motion for Partial Summary Judgment as to Liability and Statement of Undisputed Materials Facts.  ECF Nos. 43 and 42.  On October 13, 2023, Defendants filed a Memorandum in Opposition to Plaintiff's motion and a Response to Plaintiff's Statement of Uncontroverted Material Facts.  ECF Nos. 49 and 48.  On October 27, 2023, Plaintiff filed his Reply.  ECF No. 54.

The Parties substantially agree on the relevant facts related to the primary issue raised in each of their motions: whether the text messages sent to Plaintiff constitute "solicitations" or "telemarketing" as defined by the TCPA and its implementing regulations.  Defendants argue

---

[1]    Plaintiff moved for leave to file certain documents under seal—his Motion for Partial Summary Judgment as to Liability, Statement of Uncontroverted Material Facts, Memorandum in Opposition to Defendants' Motion for Summary Judgment, and Response to Statement of Undisputed Materials Facts.  ECF Nos. 35 and 44.  The Court granted Plaintiff's motions (ECF Nos. 41 and 50), and Plaintiff filed unredacted copies of each of these documents under seal (ECF Nos. 42, 43, 45, and 52).  Throughout this Order, the Court will refer to the ECF numbers of the unredacted, sealed documents and the date on which they were filed rather than to the ECF numbers and filing dates of the redacted documents.

that the text messages are not solicitations nor telemarketing because their purpose was simply to gauge Plaintiff's interest in selling his real property and/or to offer to purchase Plaintiff's home. Defendants deny that the text messages are meant to advertise Defendants' products or services for purchase.

Plaintiff argues that Defendants' position masks the true intent of the text messages: to solicit Plaintiff to purchase Defendants' services related to selling real property. Plaintiff argues that, despite Defendants' services being offered seemingly without charge, Defendants collect an "effective fee" for providing homeowners with services associated with selling property. According to Plaintiff, this "effective fee" is the difference between the price at which Defendants' would purchase a property and the higher price at which Defendants would sell the property to a third-party. Plaintiff contends that the home-selling services Defendants offer through these text messages for this effective fee are analogous to services provided by a real estate agent in a typical home sale.

The Parties' motions also raise a secondary issue: whether Core Properties can be held vicariously liable. Plaintiff argues that Core Properties is vicariously liable for sending the text messages under a theory of apparent authority. ECF No. 43 at 6, n.3. Defendants argue that a finding of vicarious liability against Core Properties requires "evidence sufficient to show that Core [Properties] controlled the manner and means by which 1000 [Calls a Day] transmitted the text messages." ECF No. 49 at 13. Defendants argue that Plaintiff has failed to present evidence that he had a reasonable basis to believe that the sender of the text messages—a third-party named 1000 Calls a Day ("1000 CAD")—did so at Core Properties' direction. *Id.* at 13–14. Finally, Defendants argue that Plaintiff has failed to offer evidence of ratification by Core

Properties.  Defendants emphasize that Core Properties "does not engage in ongoing business operations and never could have affirmed any actions by 1000 CAD."  *Id.* at 14.

Plaintiff counters that he has presented evidence indicating apparent authority as to Core Properties.  To support his argument, Plaintiff relies on (1) a text message from 1000 CAD that directed him to corepropertiesstl.com; and (2) a licensing agreement between Core Properties and Growth Development which allows Growth Development to use corepropertiesstl.com to promote Growth Development's business.  Plaintiff argues that this evidence is sufficient to show that Core Properties provided apparent authority to send the texts and that Core Properties ratified the use of its name, branding, and website when sending the text messages.  ECF No. 54 at 9–10.

C.    Facts

The following facts are undisputed, unless otherwise noted:

Core Properties, LLC was formed in 2009 by Robert Heyder as a real estate investment company.  Growth Development, LLC was formed in 2015 by Jon Rankin and Robert Heyder to invest in real estate.  Mr. Heyder and Mr. Rankin are Core Properties' and Growth Development's managers.

After Growth Development was formed, Core Properties transitioned from being a real estate company to an intellectual property holding company, which licenses its naming rights, branding, and website to Growth Development.  Core Properties owns the website domain corepropertiesstl.com.  Growth Development uses the corepropertiesstl.com website for its web presence as part of a licensing agreement.  Core Properties no longer has any substantial business operations outside of its licensing agreements with Growth Development.

Both Core Properties and Growth Development operate for profit.  Growth Development derives profit, in part, through real estate transactions by purchasing and selling real estate. When attempting to sell its real estate, Growth Development does not publicly market its listings. Rather, it consults a list it has compiled of over one hundred individuals and entities who have expressed an interest in purchasing properties.  Growth Development only offers its properties for sale to the individuals and entities included on this list.

Among other strategies, Growth Development uses outbound text messaging campaigns to locate potential properties to purchase.  Beginning in approximately 2019, Growth Development began using data provided by Audantic Real Estate Data Analytics to identify property owners who are likely to sell their homes in the near future.  As a matter of course, Growth Development does not obtain prior express written consent to contact individuals identified in Audantic's data.

On November 19, 2019, Growth Development entered into a contract with 1000 CAD. In or around June 2022, Growth Development used Audantic's data to obtain Plaintiff's contact information, including his cellular telephone number.  Plaintiff is a natural person residing in St. Louis, Missouri.  Plaintiff is the regular and sole user of his cellular telephone number.  Plaintiff uses his cellular telephone number as his personal, residential telephone number.  Plaintiff registered his cellular telephone number with the DNCR on February 10, 2008.

After obtaining Plaintiff's contact information from Audantic, Growth Development sent Plaintiff's information to 1000 CAD for the purpose of delivering outbound text messages to Plaintiff's cellular telephone number.   Prior to sending Plaintiff's telephone number to 1000 CAD, Growth Development did not scrub Plaintiff's phone number against the DNCR, nor did Growth Development obtain Plaintiff's express consent to contact him.

6

In total, 1000 CAD sent four unprompted text messages to Plaintiff's cellular telephone number: one on July 9, 2022, one on November 11, 2022, one on December 14, 2022, and one on January 11, 2023.  Growth Development authorized 1000 CAD to send the text messages to Plaintiff on its behalf.  These text messages express that the sender wants to discuss the potential of purchasing Plaintiff's home.  On December 14, 2022, after Plaintiff requested the sender to send him a website he could "check out," the sender sent Plaintiff a link to corepropertiesstl.com.[2]  ECF No. 42-8.

Growth Development maintains an internal do-not-call list and has a written internal do-not-call policy.  Growth Development's internal do-not-call policy is intended to apply to its outbound text messaging campaigns.  Growth Development's internal do-not-call policy states that Growth Development will "obey all other state and federal DNCR lists and regulations, except where exempt, including by obtaining and scrubbing against the National DNCR registry at least once every 31 days."  Growth Development considers itself to be exempt from the do-not-call provisions of the TCPA.  Growth Development also entered into a "Do Not Call Waiver" agreement with 1000 CAD in which Growth Development agreed to:

> not hold 1000 [CAD] or the owners, employees, agent, affiliates, contractors, successors and assigns for any and all liabilities, damages, claims, suits, settlements, judgments investigations, costs and expenses (including reasonable attorney's fees and court costs) liable for any legal repercussions from calling consumers on the do-not-call list.  [Growth Development] understand[s] the risks involved with calling consumers on the do-not-call list.

ECF No. 42-11, CORE 000044.  1000 CAD developed the templates for text messages it sends on behalf of Growth Development.

---

[2]     There is no evidence in the record of any additional contact from Plaintiff to 1000 CAD or to Defendants.

A real estate agent representing a homeowner—a potential seller—consults the seller throughout the sale process, lines up services necessary for the home sale, publishes a home sale listing, and manages and assists with the negotiation of the sale to a third party.[3]  A post to the Core Properties Facebook page dated February 22, 2023, states that "Core Properties St. Louis takes care of all the steps that are associated with selling your home through a real estate agent." ECF No. 42-13, Plaintiff_00011.  When purchasing a property from a seller, Growth Development negotiates a sale price and a contract for sale with the seller, and then sends the signed contract to a title company to complete the transfer of title.  Growth Development then markets homes that it is contractually obligated to buy to individuals and entities included on its buyer's list for either sale or assignment of the purchase contract.

Between 2022 and approximately June 2023, Growth Development engaged in forty-seven (47) real estate transactions arising out of its outbound text message campaigns through 1000 CAD.  With respect to twenty-four (24) of the forty-seven (47) properties, Growth Development purchased and sold the properties to a third-party purchaser on the same day. During these same-day sales, Growth Development does not disclose to the seller the amount to be paid by the subsequent purchaser.  In each of these same-day sales, the purchase price paid by Growth Development to the homeowner was less than the price paid by the third-party purchaser to Growth Development.[4]  For fourteen (14) of the forty-seven (47) properties, Growth Development entered into an assignment contract with a third-party in which Growth Development assigned its right to purchase the property to a third-party for a fee.[5]

---

[3]     Defendants dispute that this is an exhaustive list of a real estate agent's duties as a seller's agent.

[4]     The precise amount of Growth Development's revenue from these sales is disputed.

[5]     The precise revenue generated by these fees is disputed.

Growth Development uses a template purchase contract when purchasing properties.  In this template contract, Growth Development discloses that it "contemplates or may arrange the sale of the property to another potential purchaser and, in reliance on this agreement, has procured or anticipates procurement of a contract for such potential purchaser's purchase of the property."  ECF No. 42-16, CORE 002535–36.

## Legal Standard

"Summary judgment is proper where the evidence, when viewed in a light most favorable to the non-moving party, indicates that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." *Davidson v. City of Minneapolis*, 490 F.3d 648, 654 (8th Cir. 2007); *see also* Fed. R. Civ. P. 56(a).  The mere existence of an alleged factual dispute between the parties is not sufficient to defeat an otherwise properly supported motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  Rather, the law requires that there be a genuine dispute of material fact.  *Id.* at 248.  "[T]he substantive law will identify which facts are material."  *Id.*  A dispute of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party.  *Id.*

The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact.  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (citation omitted).  Once the moving party has met its burden, "[t]he nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts and must come forward with specific facts showing that there is a genuine issue for trial."  *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also* Fed. R. Civ. P. 56(c).  "The mere existence of a scintilla of evidence in support of the [non-moving party]'s position [is] insufficient; there

must be evidence on which the jury could reasonably find for the [non-moving party]."
*Anderson*, 477 U.S. at 252.

**Discussion**

The Court will first address whether the text messages sent to Plaintiff by 1000 CAD on

Growth Development's behalf constitute "solicitations" or "telemarketing" such that Growth

Development can be held liable for violations of the TCPA, 47 U.S.C. § 227(c)(5).  The Court

will then turn to whether Core Properties can be held vicariously liable for the sending of those

text messages to Plaintiff.

    A.    <u>Violations of the TCPA</u>

The TCPA states that:

> A person who has received more than one telephone call within any 12-month
> period by or on behalf of the same entity in violation of the regulations prescribed
> under this subsection may, . . . bring . . .
>
> > (B)    an action to recover for actual monetary loss from such a violation, or
> > to receive up to $500 in damages for each such violation, whichever is
> > greater.

47 U.S.C. § 227(c)(5).  The "regulations prescribed under this subsection" refer to the

regulations implemented by the Federal Communications Commission ("FCC") at 47 C.F.R. §

64.1200.[6]  Subsection (c)(2) of § 64.1200 defines one of the potential violations at issue in this

case:

> No person or entity shall initiate any telephone solicitation to: . . . [a] residential
> telephone subscriber who has registered his or her telephone number on the
> national do-not-call registry of persons who do not wish to receive telephone
> solicitations that is maintained by the Federal Government.

---

[6]    Section 64.1200 has undergone several revisions since July 9, 2022—the date Plaintiff
received the first text message in this case.  But the relevant language of subsections (c)(2),
(d)(4), (f)(13), and (f)(15), quoted below, did not change between July 9, 2022, and January 11,
2023—the date Plaintiff received the final text message.

A telephone solicitation is defined in the implementing regulations as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person," but "does not include a call or message: (i) [t]o any person with that person's prior express invitation or permission; (ii) [t]o any person with whom the caller has an established business relationship; or (iii) [b]y or on behalf of a tax-exempt nonprofit organization."  47 C.F.R. § 64.1200(f)(15).  Therefore, to find Defendants liable for violations of the TCPA under § 64.1200(c)(2), Plaintiff must establish that: (1) he received more than one text message within a 12-month period; (2) sent by or on behalf of the Defendants; (3) Defendants sent the text messages for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services; (4) without Plaintiff's prior consent; (5) to Plaintiff's residential telephone number; (6) which was registered on the DNCR.[7]

Section 64.1200(d)(4) describes an additional potential violation at issue here:

> No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive calls made by or on behalf of that person or entity.  The procedures instituted must meet the following minimum standards:
>
> ….
>
> (4)   Identification of sellers and telemarketers.  A person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted.

Telemarketing is defined as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person."  47 C.F.R. § 64.1200(f)(13).  Therefore, to find Defendants liable for

---

[7]   Defendants do not dispute that Core Properties and Growth Development operate for profit, nor do they contend that they have had any prior business relationship with Plaintiff.

violations of the TCPA under § 64.1200(d)(4), Plaintiff must establish that: (1) he received more than one text message within a 12-month period; (2) from Defendants; (3) Defendants sent the text messages for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services; (4) to Plaintiff's residential telephone number; (5) without providing the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted.

The only dispute regarding the application of the TCPA's implementing regulations to this case is whether the text messages sent to Plaintiff constitute "solicitations" or "telemarketing," i.e., was the purpose of the text messages to encourage Plaintiff to purchase Defendants' property, goods, or services. It is undisputed that Growth Development contracted with 1000 CAD to initiate an outgoing text message campaign whereby 1000 CAD would send text messages on Growth Development's behalf to homeowners like Plaintiff. After receiving Plaintiff's contact information from Audantic, Growth Development provided Plaintiff's contact information, including his cellular telephone number, to 1000 CAD. It is also undisputed that Plaintiff did not provide prior consent to Defendants or 1000 CAD to receive the text messages. Between June 2022 and January 2023, 1000 CAD sent at least four text messages to Plaintiff's cellular telephone number. Plaintiff uses his cellular telephone number as his residential phone number and registered the number with the DNCR. The text messages at issue did not identify on whose behalf they were sent, nor did they provide contact information at which the sending entity may be contacted. Therefore, the only remaining issue is whether the purpose of the text messages was to encourage Plaintiff to purchase property, goods, or services. If so, then Plaintiff

has established that Growth Development is liable for violations of both counts alleging violations of the TCPA.

1.  <u>Plaintiff's Arguments and Legal Authority as to Liability</u>

Plaintiff argues that the text messages were sent for the purpose of encouraging him to purchase services from Defendants related to selling his home.  Plaintiff also argues that Defendants provide services to property owners akin to those of a real estate agent acting as a seller's agent.  Plaintiff acknowledges that, unlike a real estate agent who charges a fee to a seller for services, Defendants do not charge a fee to property owners who choose to sell their real property to Defendants.  But Plaintiff asserts that the services are nevertheless "purchased" because Defendants collect an "effective fee" for the use of their services.  According to Plaintiffs, this "effective fee" is the difference between the sale price at which Defendants purchase the property and the higher price at which Defendants then sell the property to a third-party buyer.  Under Plaintiff's logic, the selling party forgoes its right to sell its property at this higher price in exchange for Defendants' services related to purchasing the home from the seller and locating a third-party purchaser to whom Defendants then sell the property.

Plaintiff's arguments regarding this "effective fee" as payment for Defendants' services are supported by recent case law.  Plaintiff cites to two cases from 2023 that support finding that text messages like those sent to Plaintiff are solicitations to purchase services.  Plaintiff also argues that the result in *Anderson v. Catalina Structured Funding, Inc.*, No. 1:21-cv-197, 2021 WL 8315006 (W.D. Mich. Dec. 21, 2021), a case dealing with potential TCPA violations related to phone calls in which defendant offered to purchase a structured settlement from plaintiff in exchange for a lump sum, is instructive.

In *Eagle v. GVG Cap., LLC*, No. 22-cv-638, 2023 WL 1415615 (W.D. Mo. Jan. 31, 2023), the district court denied defendant's motion to dismiss plaintiff's TCPA claims.  The plaintiff in *Eagle* alleged that text messages sent to her cellular telephone number asking her whether she wished to sell her home were solicitations sent "for the purpose of offering [defendant's] 'home selling services' to her and to provide her information to interested third party purchasers, for a profit."  *Id.* at *3.  In rejecting arguments similar to those made by Defendants here, the Court relied on FCC guidance on the meaning of solicitation in the real estate context from *In re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 20 F.C.C. Rcd. 3788 (Feb. 18, 2005) ("2005 FCC Guidance").  In the 2005 FCC Guidance, the FCC explained that "a telephone solicitation would include calls by real estate agents to property owners for the purpose of offering their services to the owner, whether the property listing has lapsed or not."  *Id.* at 3793.  Based on this guidance, the Court in *Eagle* found that the text messages sent by defendant, even if defendant was not a real estate agent, were similar enough to the real estate agent example in the 2005 FCC Guidance that they constituted solicitations to purchase defendant's services related to buying plaintiff's home.

In *Pepper v. GVG Cap. LLC*, --- F. Supp. 3d ----, 2023 WL 3914291 (S.D. Tex. June 9, 2023), another district court denied a similar motion to dismiss, finding that the consumer plaintiff had properly alleged TCPA claims.  The *Pepper* plaintiff alleged that the defendant's business consisted of buying homes for cash, that the text messages were sent for the purposes of soliciting plaintiff's procurement of defendant's services related to selling plaintiff's home, and that consumers who sold their home to the defendant paid an effective fee for these services.  *Id.* at *2.  The court rejected defendant's arguments, nearly identical to those presented by Defendants here, that the "effective fee" charged for services is not an "actual fee," stating that

14

"[t]his argument makes a distinction without a difference—[the plaintiff] would pay that fee whether she made the payment directly or indirectly, by discounting the sales price." *Id.* at *3.

The *Pepper* court relied, in part, on *Anderson* to conclude the defendant's offers to purchase plaintiff's home was inherently bundled with an implicit offer to sell the defendant's services. *See id.* at *2. The *Anderson* court found that defendant's offer to purchase plaintiff's structured settlement for a lump sum inherently involved advertising defendant's services. In responding to defendant's arguments that the defendant was only attempting to purchase the structured settlement from plaintiff and not advertise any services, the *Anderson* court explained:

> [Defendant] may view it as a purchase, but it is certainly offering a service to the payee who would like his or her cash up front. [Defendant]'s argument sounds a little like a real estate buyer's agent who tells his or her client that the home sellers will pay the fees associated with the buyer's agent's services, rather than the buyer. That is ridiculous, of course: the buyer could offer to pay less for the house if the seller did not have to pay the buyer's agent's fees. Here, too, just because the fees may be taken out of the lump sum payment to the payee rather than itemized does not mean that no fees were charged in connection with the transaction.
>
> . . .
>
> Here, . . . where Plaintiff has expressed no interest in selling, and Defendant is in the business of offering liquidity to structured settlement holders, Defendant may be offering to make a purchase, but it is also marketing a service. To suggest it is not is too clever by half.

*Anderson*, 2011 WL 8315006 at *5–6.

Based on the *Anderson* holding and the recent findings in *Eagle* and *Pepper*, Plaintiff urges the Court to find that Defendants' text messages, though ostensibly sent to make an offer to purchase Plaintiff's home, are also solicitations and telemarketing as defined by the TCPA because they offer to provide to Plaintiff the services necessary for the purchase to occur, for a fee.

2.      <u>Defendants' Arguments and Legal Authority as to Liability</u>

Defendants' arguments that the text messages were not sent for the purposes of encouraging Plaintiff to purchase services find limited support in the case law and are ultimately unpersuasive.  First, Defendants' supporting authority is readily distinguished for the facts here.  Second, Defendants fail to adequately distinguish the holdings in *Eagle* and *Pepper*.  Third, Defendants' argument that it does not provide the same services as a real estate agent does not negate that it provides services, nor do Defendants present convincing arguments that they do not charge a fee for those services.

a.      Defendants' Supporting Legal Authority

In support of its motion for summary judgment, Defendants rely on several distinguishable cases that do not control the issues in this case.  Defendants cite to *Reardon v. Uber Techs., Inc.*, 115 F. Supp. 3d 1090 (N.D. Cal. 2015) for the contention that finding liability for sending "advertisements" or "telemarketing" text messages under the TCPA requires a finding that text messages were sent to promote good or services.  That requirement is not in dispute.  As such, to support Defendants' position, the *Reardon* case must be factually analogous to the facts here.  But it is not.  The *Reardon* court found that text messages sent by Uber to potential drivers did not constitute advertising or telemarketing but were more akin to employment recruiting messages, which are not prohibited by the TCPA.  *Id.* at 1096–97.  The text messages Plaintiff received in this case are not comparable to employment recruiting text messages, and therefore *Reardon* is not instructive.

Defendants rely on several other cases where the court found that the calls or text messages were sent for the purposes of recruiting employees, but all fail to support Defendants' position that the texts at issue in this case were not solicitations or advertisements.  *See Payton v.*

16

*Kale Realty, LLC*, 164 F. Supp. 3d 1050, 1062–63 (N.D. Ill. 2016) (finding that texts merely informing plaintiff of a job opportunity were not advertisements or solicitations); *Dolemba v. Ill. Farmers Ins. Co.*, No. 15 C 453, 2015 WL 4727331, at *5 (N.D. Ill. Aug. 10, 2015) (finding recruiting text messages were not advertisements or solicitations under the TCPA); *Friedman v. Torchmark Corp.*, No. 12-CV-2837, 2013 WL 1629084, at *4 (S.D. Cal. Apr. 16, 2013) (finding that text messages promoting a webinar that may lead to employment for attendees was not solicitation under the TCPA). Again, the text messages here are not comparable to messages sent to recruit potential employees. Defendants also cite to a case where the court found that text messages offering a gift card to donate blood were not advertisements or solicitations under the TCPA. *Murphy v. DCI Biologicals Orlando, LLC*, No. 6:12-cv-1459- Orl-36KRS, 2013 WL 6865772, at *10 (M.D. Fla. Dec. 31, 2013). The facts in *Murphy* are likewise not a comparable to the facts here. The Court finds the analysis from these non-comparable cases to be unhelpful in determining whether the text messages sent to Plaintiff in this case constitute "solicitations" and "telemarketing" as defined by the TCPA.

Additional cases Defendants rely upon that are more directly on point are nevertheless also distinguishable. Defendants cite to *Jance v. Homerun Offer, LLC*, No. CV-20-481, 2021 WL 3270318 (D. Ariz. July 30, 2021) as an example of a case where text messages offering to purchase homes were found to not violate the TCPA's prohibitions on solicitation or telemarketing. In *Jance*, the plaintiff alleged that the purpose of the defendant's calls was to purchase her home. Based on these allegations, the Court granted the defendant's motion to dismiss plaintiffs TCPA claim under 47 U.S.C. § 227(c) and found that the TCPA's definition of solicitation and telemarketing does not include offers to purchase. *Jance*, 2021 WL 3270318, at *4. Defendants insist that the reasoning in *Jance* is controlling here. But in the case at bar,

Plaintiff has alleged that the purpose of the text messages he received was to solicit his purchase of services from Defendants.  Additionally, Plaintiff has presented evidence supporting his position that this was the purpose of the text messages.  Because Plaintiff's allegations and evidence are not comparable to the plaintiff's allegations in *Jance*, the court's reasoning in that case is not applicable here.

Defendants' reliance on both *Gross v. GG Homes, Inc.*, No. 3:21-cv-271, 2021 WL 2863623 (S.D. Cal. July 8, 2021) and *Knutson v. Blue Light Secs., Inc.*, No. 17-CV-134, 2018 WL 1172611 (S.D. Cal. Mar. 6, 2018) is similarly unconvincing.  In *Gross*, the Court found that text messages sent to plaintiff real estate agents by the defendant, which inquired about "off-market" deals or "pocket listing[s]," were not an attempt to solicit the purchase of services from the defendant and therefore "do not fall within the definition of telephone solicitation under the TCPA. . . ."  *Gross*, 2021 WL 2863623 at *1, *8.  But again, the situation here is not comparable.  The defendants in *Gross* were requesting that the plaintiff provide defendants with a service, i.e., the sharing of information about off-market real estate listings.  Here, no one, including Defendants, has argued that the purpose of the text messages at issue is to purchase information from Plaintiff.  As such, the reasoning in *Gross* is not applicable.  The court in *Knutson* also held that defendant's calls to a real estate agent plaintiff seeking to buy information about plaintiff's clients were not telemarketing or advertising under the TCPA.  *Knutson*, 2018 WL 1172611 at *4.  Much like *Gross*, the situation presented here is not comparable to *Knutson* because Defendant has not made an offer to purchase information from Plaintiff.  The reasoning in *Knutson*, like those in the other cases discussed above, does not support Defendants' position.

Finally, Defendants unsuccessfully argue that the 2005 FCC Guidance indicates that Growth Development's business model is exempt from the TCPA.  Defendants contend that the following language taken from the 2005 FCC Guidance is instructive:

> We find, however, that calls by real estate agents who represent only the potential buyer to someone who has advertised their property for sale, do not constitute telephone solicitations, so long as the purpose of the call is to discuss a potential sale of the property to the represented buyer.  The callers, in such circumstances, are not encouraging the called party to purchase, rent or invest in property, as contemplated by the definition of "telephone solicitation."

2005 FCC Guidance at 3793–94.

Defendants ignore the qualifying language in this guidance that renders this advice inapplicable to the facts at issue: "to someone who has advertised their property for sale." Contrast this with the guidance regarding calls by real estate agents that the FCC did indicate were solicitations: "a telephone solicitation would include calls by real estate agents to property owners for the purpose of offering their services to the owner, whether the property listing has lapsed or not." *Id.* at 3793.  There is no evidence in the record that Plaintiff "advertised [his] property for sale."  In FCC's example of a solicitation, the real estate agent makes an uninvited call to a consumer to offer the agent's services for as a seller's agent.  In contrast, the FCC's example of non-solicitation contemplates that the seller has advertised its property for sale and thus invites calls from buyer's agents looking to make a purchase offer.  As explained more fully below, though Growth Development is not a real estate agent, the services it provides are somewhat comparable to those offered by a seller's agent.  So, despite Defendants' argument to the contrary, the situation here is more akin the FCC's example of a real estate agent calling a property owner to offer the agent's services as a selling agent rather than a buyer's agent calling about a property currently listed for sale.  The 2005 FCC Guidance weighs heavily in favor of finding that the text messages here were sent in violation of the TCPA.

b.      Defendants' Attempts to Distinguish *Eagle* and *Pepper*

Defendants' arguments that *Eagle* and *Pepper* are distinguishable from the facts of this case are similarly unconvincing.  Defendants argue, without explanation, that the defendant in *Eagle* was acting "much more like a real estate agent than a purchaser."  ECF No. 7.  Defendants then focus on a fact in *Eagle* that, on top of offering to purchase the plaintiff's home, the defendant's messages solicited the purchase of consumer data that it sold to third parties.  According to Defendants, because they do not perform this service, the holding in *Eagle* is not applicable here.  But this additional solicitation at issue in *Eagle* does not negate the court's finding that the text messages were solicitations under the TCPA.  The Court is not convinced by Defendant's argument that the holding in *Eagle* relied entirely on the defendant's solicitation of consumer information rather than the offer to purchase the plaintiff's home.

In attempting to distinguish *Pepper*, Defendants first erroneously state that the court in that case granted the defendant's motion to dismiss.  ECF No. 38 at 7; ECF No. 49 at 6.  This is incorrect; the Court denied the motion to dismiss.  Defendants next focus on a portion of the *Pepper* case where the court states that "[t]he [C]ourt is not persuaded that an offer to buy a home 'as-is' amounts to solicitation prohibited by the TCPA."  *Pepper*, 2023 WL 3914291, at *2.  But Defendant's ignore the subsequent analysis and holding that the plaintiff's allegations did adequately state a claim for TCPA violations.  Defendants also argue that unlike the defendant in *Pepper* who "conceded that the payment of [transfer of title] costs out of the funds that would otherwise have been paid to the seller is an 'effective fee,'" Growth Development has not made such a concession.  ECF No. 49 at 8.  Instead, Defendants state that Growth Development "pays all fees to a third-party title company to complete the sale."  *Pepper*, 2023 WL 3914291, at *2.  Defendants argue that:

> [u]nder *Pepper*'s reasoning, a TCPA concern only arises if the real estate
> purchaser reduces the amount it would have otherwise paid for the property as a
> direct consequence of paying such costs and not as a result of other market factors
> such as buying the home "as-is" or even just getting a good deal on the purchase
> price because the seller is motivated to sell.

ECF No. 49 at 8.  The Court rejects Defendants' narrow reading of *Pepper*.  The Court finds no

such restriction in *Pepper*'s holding, nor does the Court believe that such a limitation is

necessary before the TCPA is implicated.  Finally, Defendants make a conclusory argument that

*Pepper* was wrongfully decided. The Court is not persuaded by Defendants' conclusion and finds

that the *Pepper* analysis is cogent and applicable to the issues here.

### c.      Growth Development's Services and Associated Fees

Defendants' arguments that Growth Development's business differs from a traditional

real estate agent's business is misplaced.  Defendants point to several business activities that it

contends are part of Growth Development's business model but are not part of a traditional real

estate agent's business: (1) Growth Development's purchase of properties does not involve real

estate agents; (2) Growth Development, once it signs a purchase contract, is contractually

obligated to purchase property; (3) Growth Development accepts certain risks of owning the

property after purchase; (4) Growth Development has responsibility to fund the purchase of the

property; (5) Growth Development bears the risk of being included on the chain of title, if a

dispute over the title ever arises; (6) Growth Development has no fiduciary duty to represent the

seller from whom it purchases property; and (7) Growth Development does not charge a seller a

commission or fee for services.  *See* ECF No. 49 at 10.  But Growth concedes that, when it

purchases a home, it selects the title company to be used and pays for all of the closing fees

associated with the purchase contract and deed transfer.  *Id.*

Ultimately, whether Growth Development's business model is directly comparable to that

of a real estate agent is not the question before the Court.  Rather, the Court must determine

whether Growth Development's text messages to Plaintiff were sent for the purpose of encouraging Plaintiff to purchase services for a fee.

Growth Development admits that it finds the title company for the seller and then pays the fees associated with closing and deed transfer.  This is a service.  More specifically, this is at least one service that Growth Development offers to recipients of its text messaging campaigns, like Plaintiff.

And while Defendants object that Growth Development does not charge a direct fee to sellers for providing this services, they gloss over how Growth Development earns a profit for providing it to home sellers.  Defendants agree that in a typical purchase transaction, Growth Development negotiates a purchase price with a homeowner, drafts a purchase contract according to the negotiated terms, and purchases the home for the negotiated price.  After signing the contract of sale, Growth Development negotiates the sale of that home to a third-party purchaser for a higher price or assigns the purchase contract to a third-party purchaser for a fee equal to a portion of the negotiated purchase price.  The revenue Growth Development collects from this series of transactions are the fees that are effectively paid by homeowners who utilize Growth Development's home selling services.

Regardless of the amount of revenue Growth Development earns from selling the properties that it purchases to third-party purchasers or from charging third-parties assignment fees, it is still charging the seller an effective fee for its services.  Defendants enthusiastically deny that Growth Development charges *as much* for these services as Plaintiff contends.  But, again, the issue is not how much Growth Development earns from sales to third-party purchasers or through charging assignment fees.  Rather the question is: are homeowners who sell their

homes to Growth Development charged a fee for the use of Growth Development's services? The Court is persuaded that they are in the form of the effective fee.

> d.  The Text Messages' Purpose

After carefully considering the arguments, the evidence, and the law, the Court finds that the text messages were sent for the purpose of encouraging Plaintiff to purchase Growth Development's services related to selling Plaintiff's home. Like in *Eagle* and *Pepper*, and in conformity with the 2005 FCC Guidance on this issue, the Court finds that the text messages Plaintiff received were sent for the purpose of soliciting his purchase of services from Growth Development. Despite Defendants' arguments that the text messages were merely meant as an offer to purchase Plaintiff's home, in reality, this offer is coupled with the offer to provide Plaintiff with a service for an effective fee. Plaintiff has established that Growth Development's offer includes the service of finding and selecting the title company to effectuate the purchase contract and deed transfer. Whether this service is the type of service typically offered by a real estate agent in a traditional real estate transaction is not controlling. Regardless, the Court finds that this service, and others offered by Growth Development, are similar enough to services offered by real estate agents such that the 2005 FCC Guidance is instructive. In selling a home to Growth Development utilizing Growth Development's services, Plaintiff or other consumers lose out on either the benefit of the higher price paid by a third-party purchaser or the fee charged for the assignment of the purchase contract to a third-party purchaser. Though not directly billed to the seller, the revenue Growth Development collects from these subsequent transactions are the effective fees the seller is charged for Growth Development's services. As such, the Court finds that the text messages at issue here were "solicitations" and/or

23

"telemarketing" as defined by the TCPA, and that Growth Development is liable for violations of the TCPA raised in Plaintiff's Count I and Count II.

     B.    <u>Vicarious Liability</u>

     The only remaining issue is whether Core Properties can be held vicariously liable under a theory of apparent authority.[8] "Normally the existence or nonexistence of a principal-agent relationship is a fact question left to the trier of fact.  It is only where the facts are not in dispute and there is no real issue for the jury to resolve that the trial court should rule on the agency issue as a matter of law." *Waterhout v. Associated Dry Goods, Inc.*, 835 F.2d 718, 720 (8th Cir. 1987).  Therefore, to find in Plaintiff's favor, the Court must determine whether Plaintiff has presented sufficient evidence to support finding Core Properties vicariously liable as a matter of law.

     "[A] defendant may be held vicariously liable for TCPA violations where the plaintiff establishes an agency relationship, as defined by federal common law, between the defendant and a third-party caller." *Hand v. Beach Ent. KC, LLC*, 456 F. Supp. 3d 1099, 1129 (W.D. Mo. 2020) (citation omitted).  Specific to the claims at issue here, the FCC found in 2013 that "[S]ection 227(c)(5) contemplates, at a minimum, the application of such principles of vicarious seller liability for do-not-call violations." *In re Dish Network, LLC*, 28 F.C.C. Rcd. 6574, 6584 (May 9, 2013) ("2013 FCC Guidance").  The agency principles suggested by the FCC "includ[e] not only formal agency, but also principles of apparent authority and ratification." *Id.*

     There is no evidence of a formal agency relationship between Core Properties and 1000 CAD.  "Federal common law is in accordance with the Restatement of Agency." *Golan v.*

---

[8]     Defendants do not contest that 1000 CAD sent the text messages to Plaintiff "on behalf of" Growth Development.  47 U.S.C. § 227(c)(5).

*Veritas Ent., LLC*, No. 4:12CV00069, 2016 WL 880402, at *4 (E.D. Mo. Mar. 8, 2016) (citing

*Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064 (7th Cir. 2000)).  According to the

Restatement, "Agency is the fiduciary relationship that arises when one person (a 'principal')

manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf

and subject to the principal's control, and the agent manifests assent or otherwise consents so to

act."  Restatement (Third) of Agency, § 1.01.  Here, Plaintiff does not argue that Core Properties

had a formal agency relationship with 1000 CAD as defined by federal common law, nor do the

undisputed facts support such a finding.

Even so, "[a] formal agency relationship is not required to establish a [defendant]'s

vicarious liability for the illegal acts of a third-party telemarketer; plaintiffs can also employ

principles of ratification and apparent authority in pursuing TCPA claims."  *Golan*, 2016 WL

880402 at *4.  Therefore, to succeed on his motion for summary judgment against Core

Properties, Plaintiff must establish an agency relationship exists between Core Properties and

1000 CAD under principles of either apparent authority or ratification.

Apparent authority "is created by a person's manifestation that another has authority to

act with legal consequences for the person who makes the manifestation, when a third party

reasonably believes the act to be authorized and the belief is traceable to the manifestation."

Restatement (Third) of Agency, § 3.03; *see also Pinkham v. Sara Lee Corp.*, 983 F.2d 824, 830

(8th Cir. 1992) ("[A]pparent authority to do an act is created as to a third person by written or

spoken words or any other conduct of the principal which, reasonably interpreted, causes the

third person to believe that the principal consent to have the act done on his behalf by the person

purporting to act for him.") (quoting Restatement (Second) of Agency § 27 (1957)).

The 2013 FCC Guidance provides some illustrative examples of the types of evidence that would indicate that Core Properties was vicariously liable for 1000 CAD's violations: (1) the principal allows the agent access to information and systems that normally would be within the principal's exclusive control; (2) the ability by the agent to enter consumer information into the principal's sales or customer systems; (3) the authority by the agent to use the principal's trade name, trademark, and service mark; and (4) the principal approved, wrote, or reviewed the agent's scripts.  2013 FCC Guidance at 6592.[9]

Utilizing the above definition of apparent authority and comparing the evidence presented here to the examples provided by the FCC, the Court finds that Plaintiff has established that Core Properties provided apparent authority to 1000 CAD to send the text messages to Plaintiff.  Core Properties entered into a licensing agreement with Growth Development whereby Growth Development can use Core Properties name, branding, and the Core Properties website at corepropertiesstl.com.  ECF Nos. 42-3.  Growth Development contracted with 1000 CAD to perform an outgoing text message campaign to solicit the purchase of its services.  As part of this agreement, Growth Development sent consumers' contact information to 1000 CAD, including Plaintiff's contact information.  1000 CAD used the contact information provided by Growth Development to send Plaintiff four text messages without his prior consent.  After receiving several text messages, Plaintiff inquired about a website he could reference for more information.  In response, 1000 CAD sent Plaintiff a link to corepropertiesstl.com.  Plaintiff was not directed to any website owned by Growth Development,

---

[9]     These examples are presented in the section of the 2013 FCC Guidance discussing vicariously liability for violations of § 227(b) rather than § 227(c)(5), which is at issue here. Regardless, the Court finds these examples to be illustrative of the type of evidence that would also establish vicarious liability for violations of § 227(c)(5).

26

nor was he provided any additional contact information for either 1000 CAD or Growth Development.  The text message sent to Plaintiff by 1000 CAD, with Growth Development's approval, and that included a link to corepropertiesstl.com, provided Plaintiff with a reasonable belief that Core Properties was the entity sending him these text messages.  Further, this belief is traceable to Core Properties' licensing agreement with Growth Development, which allowed Growth Development to use Core Properties' name, branding, and website in the manner it was used here.  The Court's finding is supported by the 2013 FCC guidance, which provides that evidence of the authority by the agent to use the principal's trade name, trademark, or service make can suffice to establish apparent authority for TCPA violations.  2013 FCC Guidance at 6592.

Defendants' cited authority does not support a different conclusion.  Defendants cite to *Hand* for the contention that, to establish agency under the TCPA, a plaintiff must provide evidence that the principal "controlled or had the right to control an agent and, more specifically, the manner and means of the text message campaign they conducted."  ECF No. 49 at 13 (citing *Hand*, 456 F. Supp. 3d at 1130).  However, in reading the *Hand* case in conjunction with the 2013 FCC Guidance and other case law, this statement appears to be the standard for establishing a formal agency relationship.  The Court agrees that there is no evidence here that Core Properties controlled the manner and means by which the text messages were sent to Plaintiff, and therefore it does not find that a formal agency relationship exists between Core Properties and 1000 CAD.  But, as discussed in detail above, a finding of vicarious liability under the TCPA is not limited to formal agency relationships but can instead be based on a finding of apparent authority or ratification.

27

Defendants' arguments against finding Core Properties had apparent authority are conclusory and unpersuasive.  Defendants argue that Plaintiff has failed to offer evidence that he reasonably believed that 1000 CAD sent the text messages at Core Properties' direction.  Yet Defendants fail to address the text message sent to Plaintiff directing him to the corepropertiesstl.com domain.  Defendants also cite to *Prosser v. USHealth Advisors, LLC*, No. 4:23-cv-124, 2023 WL 5093872, at *2 (E.D. Mo. Aug. 9, 2023) for the contention that "to establish apparent authority, Plaintiff must show that he had a reasonable basis to believe that the agent acted at the defendant's direction, the text messages stated they were agents with the defendant and were approved by the defendant."  ECF No. 49 at 13.  On a motion to dismiss, the *Prosser* court was deciding whether the plaintiff had sufficiently alleged the facts necessary to establish defendant's apparent authority for violations of the TCPA.  In discussing the allegations at issue in that case, the *Prosser* court cited *Gould v. Farmers Ins. Exch.*, 288 F. Supp. 3d 963, 970 (E.D. Mo. 2018) and the list of evidence presented in that case as an example of "specific allegations which, if taken as true, could support at least one, if not more, of these theories of agency liability."  *Prosser*, 2023 WL 5093872, at *2.  The Court does not agree that *Prosser* requires the court to find the three conditions it cites from *Gould* to find of apparent authority.  These conditions were not meant to be a list of facts that must be established to support allegations of apparent authority in the TCPA context, and the Court rejects the invitation to limit a finding of apparent authority to the establishment of these facts.

Because the Court finds that Plaintiff has established that Core Properties is vicariously liable for violations of the TCPA under a theory of apparent authority, it need not address the arguments related to whether Core Properties can be found vicariously liable under a theory of ratification.

**Conclusion**

Based on the foregoing analysis, Plaintiff is entitled to summary judgment as to liability against Defendants Core Properties, LLC and Growth Development, LLC.  The Court also notes that it has reviewed Plaintiff's Motion to Strike the Heyder Declaration and Related Exhibits (ECF No. 53) and the exhibits referenced therein and finds that such materials do not change the Court's foregoing analysis.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 38) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff John McMorrow's Motion for Partial Summary Judgment as to Liability (ECF No. 43) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Strike the Heyder Declaration and Related Exhibits (ECF No. 53) is **DENIED as moot**.

**IT IS FURTHER ORDERED** that, within **fourteen (14) days** of the entry of this Order, the Parties shall meet and confer in good faith and submit a Joint Proposed Scheduling Plan to govern the next phase of this case.

Dated this 15th day of December, 2023.

_John A. Ross_

**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**

29